Good morning, may it please the Court, my name is Jason Jordan, with me today is Michael Rosenberg and also Ms. Erin Peterson, who is the widow of the decedent Lt. Col. Theodore Bobkowski. As the Court is well aware, we are here today on a de novo review of a motion for summary judgment that was granted at the District Court level stating that there is no genuine issue as to a material fact with respect to the denial of a life insurance policy that was issued to Teddy Bobkowski. The rules that govern are obviously Hollinger, Ollinger, the Hoare case, and Colorado Revised Statute 107-102-C. The only real applicable element of the Hollinger case is the number two element, that whether the applicant knowingly made a false statement or knowingly concealed the fact. Here the question was posed on an application to Teddy Bobkowski as to whether or not he had asthma, emphysema, pneumonia, or other respiratory system disorders. Prior questioning wasn't there that he responded to when he was first looking at whether or not he would get this insurance? Your Honor, are you talking about the quote process? Yeah. That's right, Your Honor. There was another one in there, and that quote specifically states on there as well that the actual cost will be determined after completing a health and lifestyle questionnaire and a medical exam. The actual what? It says the actual cost will be determined after completing a health and life insurance questionnaire and medical exam. But that quote information asked him specifically if he had sleep apnea. Correct. That part did have that in there, Your Honor. And he said no? Correct. There was an answer to no on that. What we were told though by USAA Life is that they don't use that in any part of the underwriting, and then later when we're in litigation they said, well, no, it actually puts them in a different preferred class category to start off with. Well, yeah, true. I mean, that was the purpose of the questioning, wasn't it? Was to determine a quote. That is the amount that he would pay for the insurance. Correct. And that the actual cost of the policy premium would be determined after the application and medical examination portion. Okay. But it is the beginning of that process to obtain a quote. Correct, Your Honor. And I think where Her Honor is going, and what's really important here, is when you look at Colorado Revised Statute 107102C, it provides, and I quote, a provision that no statement made by the insured shall avoid the policy unless it is contained in the written application, and a copy of such application is endorsed upon or attached to the policy when issued. And the issue that the appellant raises here, Your Honor, is that the district court, let to it under 107102C, was 56 pages. And it included that medical questionnaire that is Appendix Volume 1, page 196, which simply asks the question, as I phrased it at the beginning of my argument, which was emphysema, asthma, and of course this happens down the road later, right? So that's what was attached. We argue that the district court erred in looking at over 580 pages instead of 56 pages. They looked at information extrinsic and way outside of what they're supposed to look at to allow the insurer to avoid the policy. In the Hollinger case, the decedent worked for the insurance company that his widow was suing. He sold insurance and he trained other salespeople. What are you suggesting would be the universe of information the court could have looked at? I'm sorry, Your Honor? What are you suggesting is the universe of information that the court could have looked at? It could have looked at, pursuant to 107102, the 56 pages that are outlined in Appendix Volume 1, pages 163 to 208. That was what was contained and attached to the policy. That's what 107102c says. That they can only, that they're written, it says that a provision that no statement made by the insured shall avoid the policy. So a statement in a quote can't void the policy unless that quote is attached to the policy. It's endorsed and attached to the policy. And we're talking about item number two, right, of the Hollinger test. Well, in West Coast Life, they looked at a great deal more than that, didn't they, in making a determination as to whether there was deception, as to a knowing false statement. They looked at the whole circumstances of his history. Correct, Your Honor. Making that determination. Well. Correct, Your Honor. Well, that wasn't a limitation to 56 pages, was it? No. And I think that goes to the issue, and I think somewhat problematic about not to look at the subjective person, Bob Kowski, but look at the objective, reasonable person. Since he's deceased, which is the only way that we're here, you have to look at some other things surrounding what that person may have known while not looking at the subjective standard. It's kind of. And that's not what's happening in Hoar, right? I mean, we're looking at objective characteristics about him, things that he did. Correct. Abstract from that as to this, a reasonable person who did these kinds of things, engaged in these kinds of high-risk activities, would they have known? Who had an aqua lung. Right. Would he have known? And I was going to get there, Your Honor. I appreciate that. All right. Well, why not? I don't understand, then, what your premise is, that somehow or other we would be limited to 56 pages if that doesn't appear to be what was going on here. Well, Your Honor, I believe that in the Hoar case, and I was going to get there, Your Honor. Okay. Please. That in the event that the court finds that you can use those extrinsic evidence, and that's what I was going to talk about, because I think you almost kind of have to to some standard. It's the objective standard of the reasonable person. And the difference in the Hoar case compared to our case is really clearly distinguishable. In Hoar, this man had gone heliskiing 15 to 20 times, six years straight, okay? And he had, as His Honor pointed out, an Avalon, which helps you breathe in the event that you get buried by an avalanche, an avalanche beacon, and he signed a written waiver stating that he understood it to be a hazardous activity that could cause death. That person died heliskiing. He died doing the very thing that he failed to disclose. There's a nexus there. There's the element five, that detrimental reliance comes out in that nexus, number one. Number two, it was in the Bobkowski matter, what the appellee has done is gone and taken the deposition of doctors, saying, doctor, you would not consider this to be a snoring problem, which is what Bobkowski did. There's evidence to show that that's what he had thought, that he just had a snoring problem. Well, just because the reasonable doctor doesn't consider it to be just a snoring problem and would be a respiratory issue is something that is not the reasonable Bobkowski or the reasonable lieutenant colonel in the Air Force who's an engineer. You're saying he would have had no notice that he has sleep apnea? Is that what you're telling me? No, Your Honor. I'm stating that he would not have known. And that's the question that's on the form, sleep apnea, respiratory condition, little pop-up. What does that include, sleep apnea? And that's where I was going to go, Your Honor. The pop-up, the hyperlink, what the court found, ultimately, and what the appellee argues, is that no reasonable person in Mr. Bobkowski's condition, someone who had been diagnosed with sleep apnea, could have checked that box, no. That read, emphysema, asthma, or pneumonia, or other respiratory disorder. But we contend USAA's own application shows that they know a reasonable person may not know that that's considered a respiratory disorder. Are you saying that we can't consider the pop-up? No, I'm saying you can consider the pop-up now. Well, if we can consider the pop-up, what it says, what that would say is any reasonable person who might have an iota of a question is going to look at the link. I mean, it doesn't say that you're unreasonable. I mean, it doesn't telegraph that somehow or other a reasonable person would not know that a respiratory illness equals sleep apnea. I mean, if I were doing this, I would want to be darn sure before I checked that box, even if I had some sort of common sense notion about it. Your Honor, respectfully, I disagree, because why, if a reasonable person may never know, could not answer that question no, that had been told that they have sleep apnea, why is there a hyperlink that says explain other respiratory system disorder that is inside that pop-up, which they can't tell us if he clicked on it or not, that then says, oh, by the way, this means sleep apnea and seven other things? I guess what I'm saying is, I guess, two questions. One, would we fashion, therefore, a rule that would penalize insurance companies for trying to be absolutely clear about what they're asking you to do? Because that's exactly what this would be. It'd say that, in other words, they're signaling that a reasonable person would not have known by the text that sleep apnea is included in respiratory things by virtue of the fact that they have a pop-up. That's what you're saying, right? No, Your Honor. What I'm saying is somewhat different. Okay. What I'm saying is the appellee argues in its answer brief that what we propose, essentially, which we didn't propose, but that it would be a completely unworkable scenario, if you recall that in the briefing, basically saying if we had to list every ailment, every malady, whatever, it would be completely unworkable. My position and our position is that they already did it. They already typed it out, but then they hid it into a explain hyperlink. They actually went more workable, an extra step, to code a hyperlink. All they had to do was put those seven ailments in with the question, and then there'd be no argument. But they don't do that. They ask asthma, emphysema, pneumonia, which most people would assume, I would believe as well, is a lung issue. Not necessarily what he believed he had, which was a snoring issue, which is why his wife told him to go to get a sleep study test because he was keeping her up. If we can consider, as I think I understood you to say, this full form, including the pop-up, then let's back up here. All we're asked to say is when he checked that box, whether he committed a knowing falsehood. Correct. Okay. Well, if we can consider that entire form, he knows he has sleep apnea, and we don't have to know whether he hit that box. What we know is he's charged with knowing what's in that form. In that form, it says sleep apnea. I'm following this little logical train, and I want you to take me off of it because it seems to me that logical train ends up with, if there's reason for him to know, an objective person to know, then there's a falsehood here. Well, Your Honor, I guess saying it doesn't matter that he clicked on it, or you can tell if he clicked on it, I think is just not really workable to go back. Does it matter if law? Does it matter whether he clicked on it or not? Of course it does. Click grass? In USAA life can easily put a tracking device on the application process to see what people look at, or they could put the actual content in the question, which what His Honor is essentially saying and what the appellee is arguing as well is that using Black's Dictionary or Google, or if you click on a hyperlink, back when Hollinger and Ollinger and even the Hoar case, the application was in 2004, the decision was in 2009, they're all done over the phone. They're not contemplating internet drop down or Google searches. That's not what this is. What you look at is what's in the actual application itself. You would have to make a logical step, and it raises an issue and a question, a genuine issue as to a material fact as to, did he click on it? Did he know? In the application itself, or the application itself, which includes hyperlinks. Correct, Your Honor, it includes hyperlinks in the application itself. And so why is this any different than a scenario in which you had all that information and then I drop a footnote, okay, and I say, you know, just for those who aren't entirely clear, this is what it means. Are you telling me that somehow or other that by virtue that I had to put it in text? I mean, I would have to put... Did you say a footnote, Your Honor? Yes, I said a footnote, which is the equivalent of a hyperlink. Well, I would not think it was an equivalent because a footnote would be on the same document that you're reading. A hyperlink, clicking on that is like going onto the internet and clicking on something else to bring up a definition or go research your own definitions. Try an endnote. I mean, you have to go to the... Try an endnote. You have to go to the back of the document to see it, okay? An endnote as opposed to a footnote? Okay. What's the difference? I mean, the bottom line is if I click the hyperlink in that situation, that'd be quicker in some ways than me flipping back to hit the endnote, wouldn't it? Sure, it would be. But it would be even better if it was just in the actual question that the applicant is reading. All right, then let me back up. The question is not whether it has to be better. The question is whether it is legally sufficient. And so the point... So, I mean, the notion of whether being an optimal insurer they should have done something better is not what we're here to talk about. And so what I'm asking you is as a matter of law, what is it that says that they had to put it in text if the information was in the application? It's not... I'm not arguing that they had to as a matter of law. What I'm arguing is that if you're going to look at extrinsic evidence outside of what's in those 56 pages that we discussed, okay, then you have to look at the evidence evenly. You have to look... And in this case, the district court weighed the evidence and took the role of the fact finder. There's other evidence such as did he knowingly make the representation that he did not have it, okay, that he did not have sleep apnea when he clicked on it. Well, how do we know that he clicked on that hyperlink, number one? Number two, he signs a medical release authorization which, mind you, is attached in those 56 pages where USAA Life says... Before you run totally out of time, I had one question. Didn't he also answer a question, no, that asked him, has the insured consulted a healthcare provider for any reason not previously disclosed? I believe so, Your Honor, yes. He said no to that question. I believe so. And that's not an accurate answer, is it? If you look at sleep apnea as a medical condition, which it is, then no, that would not be an accurate answer. But I believe that the only argument we have here is the 5B portion. I don't have the site in front of me. It's page 196 of volume one of the appendix. But is that 5B question emphysema, asthma, pneumonia, or other respiratory system disorder? And if I... I know I have 10 seconds left, or am I... I'm over. You're actually over, yeah. Thank you. Thank you, counsel. Good morning, Your Honors. May it please the court. Could you follow up on the question I just asked? There is a question on the application form that asks whether the decedent had any other medical conditions he failed to disclose. Do we consider that, or do we look only at the one that's been discussed about respiratory system disorder? The court can consider both. The district court considered both. Both were raised, and both are addressed in the general form of the fact that in our response brief, and I believe it's near page 28, we talk about the fact that a decedent or an objective person in this circumstance would know to answer... Would know to disclose obstructive sleep apnea on this life insurance application, whether it's question five or question 12. Question five is more specific, and quite frankly, it's harder to imagine missing question five and then thinking, you know, well, but at a minimum, at least it would be question 12 that is true. The focus of the parties generally has been on question five because it is so clear. It is a respiratory system disorder question. It is limited to that, and the narrow limited question on appeal is using an objective standard, not a subjective standard, whether the objective person who sleeps hooked up to a machine every night to force air into his lungs and has visited a specialist for obstructive sleep apnea would know to disclose that diagnosis on a life insurance application. Further, the specific circumstances for this court, as considered by the district court, for that same objective person is someone who underwent sleep studies, went to a lab to sleep at night to be tested, was diagnosed with obstructive sleep apnea, visited a specialist specifically about this to learn more information, was told by that specialist this is a serious medical condition, had that specialist explain to him it's caused because your airway is clogged while you sleep, preventing you from breathing while you sleep, who hearing that then proceeded to use that CPAP machine regularly and even had a smaller version he traveled with. The district court reached the only reasonable conclusion in this case. The objective person in that context would know to disclose obstructive sleep apnea on the USAA life insurance application. To avoid this clear result, appellant makes two legal errors. The first is to criticize the district court for considering evidence outside the application itself. By doing so, appellant is conflating the first two elements of a rescission defense. And then secondly, appellant asks this court to use a subjective belief standard instead of objective circumstances. The argument we just heard from appellant focuses more on objective, but the evidence in the briefing and the arguments being made or evidence cited to in the record is subjective evidence, not objective evidence. Both of these arguments are contrary to Colorado law. Now starting with the first issue, the appellant conflates these elements. So as a starting point, element one, which has not been appealed, element one asks was there a false statement made on the application. Question five or question 12, answering no was a false statement. That the fact of it being a false statement has not been appealed. Element two then asks whether the false statement was made knowingly. Now here is where appellant conflates the legal standard. It starts with this, the false statement itself must be in that application. That false statement is the answer to question five and the answer to question 12. But to know whether that statement was false or to know whether it was made knowingly, the court must consider context. It must consider extrinsic evidence. That's exactly what this court did in the Hoar case. In the Hoar case, the court specifically then looked to, first of all, a similarly constructed question. A question that started with examples such as, in that case, boat racing, car racing, skydiving, parachuting, or other dangerous activities. We have a similar construct here. Things that involve a respiratory system as a starting point for question five, emphysema, asthma, pneumonia, or other respiratory system disorder. Now there is a difference between an ambiguous question and a broad question. Ambiguous obviously could mean many things. This question is not ambiguous. It is referring to the respiratory system, which involves breathing, and those parts Well, but I think, I take counsel's point. When I read that list, I think lungs. Lung disorder. It would include a lung disorder. That's part of the respiratory system. But it also includes breathing, because breathing is part of the respiratory system. But I don't know if I would have thought of sleep apnea, which really is not directly related to lungs. Well, the question for the objective person is, in this circumstance, would this person have thought of sleep apnea? When this person has not only undergone testing, but then He would just look at the list and say, I don't have any of those. I'm good. Well, I don't agree that the objective person would do that. Because an objective person who has had it explained to them, and who is sleeping hook up to a mask at night, understands they have a problem with breathing. They understand they have a problem with the respiratory system. It also then would go to question 12. Have you been diagnosed with anything else? He would know he has been diagnosed with obstructive sleep apnea. He would know from his doctor that this is a serious medical condition. Therefore, he would know that the application calls for disclosing that condition. Let me ask you about question 12, and pardon me, I just don't want to take the time to go back and look in the district court a decision on this. Question 12, did the district court find that the statement was false, and that it was knowingly false? Yes. Because the court went through the background of an objective standard about what the decedent or someone in that situation would know about their condition, and focused mostly on question five, it being a respiratory system disorder, but then concluded as well, it also would have been responsive to question 12. And therefore, it was a knowingly false misrepresentation on number 12 as well. Okay. And is it your understanding that an appellant is challenging that determination as it relates to question 12 as well? Yes. I believe on element two, knowingly, I believe they've done both. But as a starting point, that begins the problem of conflating the elements. Once you separate those two out though, and are allowed to look at the context for determining knowingly, appellant, in their briefing, and at least the arguments they reference, and we heard some of that this morning, they request a subjective knowledge test, because they focus on what the decedent actually knew, or what the appellant subjectively believes he would have known, rather than objective facts, the actual circumstances surrounding him. And that's a critical distinction between what the Colorado law requires, and what this court looked at in Hoar, versus what appellant is asking the court to look at, and claiming would create a genuine issue of material fact. Why isn't question 12 ambiguous then? As an insured, consulted health care provider, for any reason not previously disclosed, what does that necessarily lead someone to believe? I mean, if they believe that they didn't need to disclose 5, why would they feel they need to check the box for anything? 12 would depend on the context. What specific thing was not disclosed? There are a number of things that someone could say they did not disclose, and it would raise a genuine issue of material fact, whether that particular condition fits within 12. Obstructive sleep apnea is not one of them in this case, because of the context we have of this decedent, and the long medical history he has of going to see a doctor, asking for an explanation of his test results, going to visit a specialist, and carrying that diagnosis, and constantly having treatment every night for that exact diagnosis. Well, I guess what I'm saying is, well, to your, as I understood you, then the non-ambiguity of 12, it relates to the nexus to 5. In other words, the fact that he should have answered sleep apnea, but did not, so he did not disclose it, but then had gone to a provider for something he had not disclosed. That made 12 clear, and it also made his answer false, knowingly false. Potentially, but just to clarify, because I'm not sure that the 5 and 12 quite converge that way. Well, if they don't, then I thought I understood you to say there are certain circumstances under which 12 would be ambiguous, so what is the dividing line there? What I want to be clear on is that the objective facts here, as set forth, satisfy both 5 and satisfy both 12. Yes, but do they satisfy 5 independently, I mean 12 independently from 5? Yes, meaning even if 5 wasn't on the application, it would still satisfy 12. And how so? Because 5 speaks to sleep apnea, and if 5 wasn't on the form, why would he feel the need to disclose anything? Because he has gone to specialists about a specific diagnosis, and having gone through an application that didn't ask him at that point about apparently a particular diagnosis he has that he felt was responsive to those questions, he would then be asked, have you consulted a provider for anything else? And knowing he carries a diagnosis and not only seeks treatment, but regularly treats that condition by sleeping hooked up to a machine every night, is sufficient to demonstrate that the application called for disclosure of that specific condition. There could be other medical conditions that it would not fit within 12, but this case is a good example of this other category that you're talking about. Well, for example, appellant raises, you know, if someone fell and broke their leg years ago, they clearly visited a doctor for that. Is that really something they would have thought to include in there? It may not be, and it may not be something that would meet the standard of Hollinger that should have been disclosed. But here, when you have an ongoing medical diagnosis, ongoing treatment, nightly treatment really, about a specific medical condition, sufficient to have gone to a specialist to ask about what does this mean and how, what causes this? That is enough to satisfy both questions, 12 independently, to your question. All of the things being raised by appellant are subjective issues. In fact, what we just heard about a subjective thing was, did appellant or did the decedent actually click on the link? That is subjective, whether he did or did not. The question for this court is objective. What was the context available to this individual? As the court knows from the record, the decedent answered numerous questions incorrectly. This is not the only one he got wrong. And why that matters is, it's not a situation of simply saying, well, the decedent answered every question correctly except for this one, question 5, and maybe in question 12, where it just wasn't clear what was being asked. And so that would potentially lend credence to the idea of he just didn't know. Appendix page 66 provides a chart of all the things that were not disclosed. Now only obstructive sleep apnea turned out to be material. But the context put forth then, in this case, for this decedent, is the decedent answered no to multiple questions that should have been answered yes. With the objectively reasonable person who completed a quote first, a quote that asked about sleep apnea, but said no to it, and then goes on to an application that says make sure you have your medical history ready, that's what the application says, that says here are definitions in case you don't know what this means, coupled with who is familiar with computers, who is an engineer, coupled with this entire medical history and visiting doctors, would that objectively reasonable person know this is called for on the life insurance application to disclose a diagnosis of obstructive sleep apnea? And the answer here is yes, and in fact, it's the only answer based on the undisputed facts. Based on the specific circumstances of this decedent's medical history, those sleep tests, seeing a specialist, that diagnosis, sleeping every night with a mask to force air into his lungs, an objectively reasonable person in those circumstances would know to disclose obstructive sleep apnea on the life insurance application. As a result, the district court correctly granted summary judgment, and this court should affirm that judgment. Thank you. Thank you, counsel. Thank you both for your arguments this morning. The case is submitted. We will take a 10-minute recess at this time. When we return, we will hear arguments in Farmland Partners versus Fortuna.